FIDELITY TRUST CO. v. AMERICAN SURETY CO. et al.

(Circuit Court, E. D. Pennsylvania. December 11, 1909.)

No. 50.

1. BONDS (§ 62*)—CONSTRUCTION—EXTENT OF LIABILITY.

Defendant's principal having contracted to execute a statue in bronze, in order to secure the first payment on the approval of the sketch model, in accordance with the contract, gave a bond with defendant as surety, reciting that its condition was such that, if the principal should well and truly provide all materials and perform in a good and workmanlike manner all the work covenanted and agreed by him to be provided and performed in the contract, and in each and every respect do and comply with all and singular the terms and stipulations of the contract for him to perform and observe, the obligation was to be void, otherwise of full force and virtue. *Held*, that the bond, though an absolute obligation to pay money, was so modified by the accompanying conditions that plaintiff on breach thereof could only recover for such damage as followed the principal's breach of the contract.

[Ed. Note.—For other cases, see Bonds, Dec. Dig. § 62.*]

2. BONDS (§ 62*)—CONTRACTOR'S BOND—CONSTRUCTION.

Plaintiff employed an artist under a written contract to construct a bronze statue for $35,000, to be paid as follows: 10 per cent. when the sketch model was approved; 10 per cent. when the staff model was completed and placed on its pedestal; 20 per cent. when the full-sized plaster model had been delivered at the foundry; 30 per cent. when the bronze statue had been completed and accepted; and 30 per cent. when the statue was completed and accepted—the artist being required prior to each payment to give bond in an amount equal to the sum paid to complete the contract. The first two payments were made and bonds given pursuant thereto, when the artist made default, and did nothing further toward the completion of the contract. *Held*, that the provisions for payment did not make the contract separable into as many contracts as there were steps, on the completion of each of which payments were to be made, but that it was entire, and that for the contractor's breach defendant surety was liable for the amount plaintiff had paid to him pursuant to the bonds, and not only for nominal damages.

[Ed. Note.—For other cases, see Bonds, Dec. Dig. § 62.*]

Action by the Fidelity Trust Company against the American Surety Company and others. On motion by defendants for a new trial, and for judgment notwithstanding the verdict. Denied.

John Marshall Gest and John G. Johnson, for plaintiff.
James H. Westcott and W. W. Smithers, for American Surety Co.

J. B. McPHERSON, District Judge. This controversy arises upon the following undisputed facts:

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Richard Smith of the city of Philadelphia died in September, 1894, leaving a will by which he provided inter alia for the erection of an elaborate and costly structure in Fairmount Park. He spoke of this structure as "a monumental memorial," and directed the plaintiff to erect it as trustee under the will, specifying that

"The said memorial is to include equestrian statues in bronze of Major-Generals George B. McClellan and Winfield S. Hancock and colossal statues in bronze of Major-Generals George G. Meade and John F. Reynolds; the niches in the right and left wings of the design to have pedestals to receive bronze busts of the following distinguished Pennsylvanians, namely; Governor Andrew G. Curtin, Major-General John F. Hartranft, Admirals David D. Porter and John A. Dahlgren, General James A. Beaver, Major-General S. W. Crawford, and in addition thereto the architect, James H. Windrim, and my executor, John B. Gest. A mural tablet in bronze will be placed upon the pedestal stage of one of the main columns with the inscription 'This Monumental Arch presented by Richard Smith, Type Founder, of Philadelphia. In memory of Pennsylvanians who took part in the Civil War, whose strife was not for aggrandizement, but when conflict ceased, the North with the South united, again to enjoy the common heritage left by the Fathers of our Country, resolving that thereafter all our people should dwell together in unity.'

"Upon the pedestal stage of the other main column will be placed upon a bracketed rest, on the right of the entrance front, a statue of myself, in bronze, and underneath, the name of Richard Smith, in large letters. The central part of said memorial to be for a carriage way, and on either side passages for pedestrians. And I direct that the entire expense of the memorial and the erection and completion thereof shall not exceed five hundred thousand dollars ($500,000)."

In the course of carrying out the testator's instructions, the plaintiff entered into a written contract with Paul W. Bartlett, a sculptor, on November 2, 1898, by which Bartlett agreed:

"That he will himself design, model and sculpture, to the best of his art and skill, an equestrian statue of the late Major-General George B. McClellan, and complete the same in bronze set in place as a part of the Monumental Memorial to be erected in West Fairmount Park, Philadelphia, under the provisions of the will of the late Richard Smith, within two years from the date of September 1, 1898."

The agreement then went on to provide:

"The total height of the horse and rider shall be one hundred and eighty inches, more or less, above the bronze plinth or base upon which the statuary rests, the sizes of the horse and rider to be in proportion thereto.

"The model shall be subject to the approval of the party of the first part, or its authorized agent. After the model has been approved by the party of the first part, or its authorized agent, the same shall be cast in bronze of the formula ninety per cent. pure copper, seven per cent. pure tin, and three per cent. zinc or spelter the section of the metal in the casting to be in no place less than one quarter of an inch in thickness; the casting to be done by a reputable bronze foundry, executed and finished in the most artistic and workmanlike manner.

"The party of the first part, or its authorized agent, shall have the right to test the bronze used in said castings, and reject the same if found not in accordance with the formula stipulated in this contract; and, for the purpose of making tests, coupons shall be cast upon each piece of casting to be removed by the representative of the party of the first part for such tests.

"The castings shall be inspected and approved at the foundry by the authorized agent of the party of the first part before acceptance.

"The plinth or base upon which the statue rests, shall have a concealed gutter cast to receive all drippings from storm water, and connection provided to a conductor furnished under another contract. There shall also be con-

structed in the plinth or base in a suitable position, and according to working drawings provided by the party of the first part, a trapdoor and frame for access to the statue from the core wells provided in the contract for granite work.

"The statue shall be attached to the granite work with proper bolts, clamps, etc., of bronze, in the best style of art, and to the entire satisfaction of the authorized agent of the party of the first part.

"Second. The party of the second part hereby agrees to submit at his studio to the party of the first part, or its authorized agent for approval, one or more sketch models in clay, wax or plaster, of the statuary he is to execute, at a scale of two and a half inches to one foot, prior to the commencement of any work upon the enlarged model; if the party of the second part fails to make this model acceptable to the party of the first part, then this contract is void, and ceases to be obligatory on the party of the first part, or upon the party of the second part; if said sketch model is approved, the party of the second part further agrees to make a duplicate thereof in plaster and deposit the same with the said trustee; but it is distinctly understood that said duplicate is not to be published, and is to remain the property of the party of the second part; and the said party of the second part further agrees to furnish and set in position, a full sized model in staff or cement of the subject from an approved sketch, upon a temporary full sized model of the Monumental Memorial to be erected in staff in said park, under a contract with other parties.

"The said party of the second part agrees after the full sized model has been set in position on the staff structure, to make such modifications in dimensions or design as may be mutually agreed upon by the parties hereto.

"Third. The party of the second part also covenants and agrees that according to the provisions of this agreement he will proceed without delay to prepare the sketch model, the model for the staff structure, and the finished model, and cast the equestrian statue; that he will insure said model and statue in an insurance company satisfactory to the party of the first part, until the said statue in bronze shall be completed, and set in place, and, in an amount to be increased from time to time, according to the payments made herein and equal to the total amount thereof, pay the premium of insurance thereon, and assign and deliver the policy of insurance to the party of the first part; that he will ship said statue at his own expense to the city of Philadelphia, in a proper manner to prevent injury in transportation, and that he will set it up on the said Monumental Memorial in the city of Philadelphia, in the position thereon designated, in conformity with the provisions of this contract; and that upon the completion of said statue, the same shall, upon being accepted by the party of the first part, be free from all incumbrances.

"It is hereby specifically covenanted and agreed that no lien shall be filed against said statuary or Monumental Memorial, by either the contractor or subcontractor, or other person or persons.

"Fourth. It is further covenanted and agreed by and between the said parties of the first and second parts, respectively, that no change of any kind or character whatever shall be made in the design of the sketch model as approved, unless such change be agreed to in writing, and signed by the parties hereto, respectively; and the party of the second part shall make no claim of any kind or character whatsoever for any extra compensation of said equestrian statue, either for services rendered or materials furnished.

"Fifth. And it is further agreed by and between the said parties of the first and second parts that the said party of the second part shall promptly and without delay prosecute the work to be done by him under this contract, with all diligence, to insure the completion thereof within the time limit of this contract; that if he should fail to commence the said works promptly, as herein provided, or shall fail, in the judgment of the party of the first part, with reasonable diligence to prosecute the same as herein provided, then, and in either case, the said party of the first part shall have the power to annul this contract by giving notice in writing to the party of the second part, or his legal representatives; and upon the giving of such notice, all moneys unpaid on account of this contract shall be and become forfeited to the said trustee (party of the first part) and the party of the first part shall thereupon be authorized to proceed to provide for the completion of said sculpture and statu-

ary, wholly free and discharged from any and all obligations to the party of the second part in respect to the matters and works mentioned in this contract, with the right of party of the first part to compensation from the party of the second part for such damages as may result from his failure to faithfully keep and perform this agreement.

"Sixth. The said party of the second part shall give to the party of the first part the written bond of a surety company satisfactory to the party of the first part, for the faithful performance by him of the terms of this agreement (said bond to be increased from time to time, according to the payments made hereunder, and equal to the total amount thereof), and pay its premiums, charges and expenses for giving such security; and, if said premiums be not paid by the party of the second part at the time they fall due, the party of the first part may pay them, and they shall become a charge against the said party of the second part, and may be deducted as a lien from any amount due, or to become due, in payments to be made under this contract."

In consideration of the faithful performance by Bartlett of the foregoing covenants, the plaintiff agreed to pay:

"The aggregate sum of $35,000 in the following installments:

"(1) Ten per cent. or $3,500, when the sketch model is approved.

"(2) Ten per cent. or $3,500, when the staff model is completed and placed on its pedestal.

"(3) Twenty per cent. or $7,000, when the full sized plaster model has been delivered at the foundry.

"(4) Thirty per cent. or $10,500, when the bronze statue has been completed, accepted by the party of the first part or its authorized agent.

"(5) Thirty per cent. or $10,500, the final payment, to be made, when the bronze statue shall be set in place upon the said Monumental Memorial and accepted as completed by the party of the first part, or its authorized agent."

The sketch model provided for by the contract was made and approved, and thereupon the plaintiff on June 16, 1899, paid to Bartlett $3,500, the first of the foregoing installments. A bond for this amount had previously been executed and delivered by Bartlett and the defendant company, the bond being in the usual form of an absolute obligation to pay $3,500 to the plaintiff, accompanied by the following condition:

"Whereas the above-named Paul W. Bartlett has entered into a contract with the said the Fidelity Insurance, Trust & Safe Deposit Company, as trustee, as aforesaid, bearing date the second day of November, 1898, to design, model, and sculpture an equestrian statue of the late Major General George B. McClellan, and complete the same in bronze, set in place as a part of the Monumental Memorial to be erected in West Fairmount Park, Philadelphia, Pennsylvania, and

"Whereas, the said the Fidelity Insurance, Trust & Safe Deposit Company is entitled to a bond in the sum of thirty-five hundred dollars ($3,500) according to the terms of said contract, at the time the sketch model is approved and payment made therefor, for the performance of said contract:

"Now the condition of this obligation is such, that if the above bounden Paul W. Bartlett shall well and faithfully provide all materials and perform in a good and workmanlike manner all the work covenanted and agreed by him to be provided and performed in the said contract, and in each and every respect perform, do and comply with all and singular the terms and stipulations in said contract for him to do, perform and observe, then this obligation to be void; otherwise, to remain in full force and virtue."

On November 11, 1899, the full-sized staff model was approved and placed in position, and the second payment of $3,500 was made. In the receipt for that sum Bartlett acknowledged "that the approval of this model is subject to the corrections suggested by the committee

of the Fairmount Park Art Association." A second bond for $3,500 was executed and delivered by Bartlett and the defendant company on November 8th; the form of the instrument being in all respects similar to the form of the bond that had been given in the preceding June. For reasons which do not appear, Bartlett failed to complete his contract by September 1, 1900, and the next step that is disclosed by the evidence is the giving of notice to Bartlett and to the defendant company on January 29, 1902, to the effect that, as the contract had not been complied with, the surety company would be held liable upon the bonds hereinbefore referred to. There is no doubt that negotiations to some extent followed these notices, and there was an evident disposition to deal leniently with Bartlett's default, for on September 6, 1902, a supplemental agreement was entered into extending the time for completion. It need not be set out in full. It recites the original agreement, the first two payments, the giving of the two bonds, Bartlett's failure to complete the statue, his request for an extension of time, and the plaintiff's willingness to consent; and then declares that Bartlett—

"will proceed with his said contract to design, model and sculpture, to the best of his art and skill, the equestrian statue of Major General George B. McClellan and complete the same in bronze, set in place as a part of the Monumental Memorial erected in West Fairmount Park, Philadelphia, under the provisions of the will of the late Richard Smith, on or before July 1, 1903."

The remaining clause of the agreement ratifies and confirms the original agreement, except as thus modified. The defendant company agreed to the extension, but stipulated that no suit by reason of any default should be brought against either Bartlett or itself after January 1, 1904. Whether any further effort was made by Bartlett to complete the statue was not distinctly proved, but it did appear without dispute that the work has not been done. The statue was not delivered, probably has never been finished, and accordingly on July 6, 1903, the plaintiff notified Bartlett and the defendant company that the extended time limit had also expired without result, and that the company would be looked to for the payment of "the sum of $7,000, with interest, in accordance with the provisions of the two bonds above referred to." The present action, which was begun before January 1, 1904, is upon the bonds in question, and claims to recover the two installments of $3,500 each, with interest from the date of suit. Bartlett was not served with process, and the trial proceeded against the surety company alone. The company offered no evidence, and the court directed a verdict for the plaintiff, subject to the following two points presented by the defendant:

"(1) Under all the evidence your verdict should be for the defendant.
"(2) Under all the evidence your verdict cannot be for the amount of the bonds, but only for nominal damages."

As it seems to me, the question for decision is comparatively simple. Of course, the bonds in suit, although in part they are absolute obligations to pay money, are so modified by the accompanying conditions that the plaintiff can only recover for such damage as may appear to have followed Bartlett's breach of contract. But I am unable to appreciate the force of the argument that no damage at all has been done,

or, at the most, only nominal damage, and that the plaintiff has failed to prove this essential branch of its case. The plaintiff has certainly parted with $7,000 in reliance upon the fulfillment of the contract. Bartlett received the money, and failed to complete the work that he engaged to perform. If, therefore, the contention that is now urged upon the court must be upheld, the plaintiff has paid $7,000, and has received nothing in return. In my opinion there is only one ground upon which this argument can possibly stand, namely, that the covenants of the agreement are independent—so unrelated to each other that the court should regard them as separate undertakings. Upon this view there would be a separate and independent covenant to make a sketch model, for which the plaintiff must irrevocably pay $3,500, whatever might happen to the contract afterwards; and a separate and independent covenant to complete and set in place a staff model, for which the plaintiff must irrevocably pay a second sum of $3,500, and so on, with the other three covenants to pay installments of the price. It is conceivable that such an agreement might be made, but positive language would be needed to bring about so unusual a result; and it is hardly to be doubted, I think, that no such construction can be put upon the contract under consideration. Even if its meaning were ambiguous, the modern view taken by the courts would lean toward construing it to be entire rather than divisible. The subject is referred to in Wald's Pollock on Contracts (3d Ed. by Williston) p. 371:

"In the earlier decisions the courts inclined to treat the several terms of a contract, unless expressed to be dependent on the other party's performance, as separate and independent promises, paying little regard to the effect which default in some or one of them might produce in defeating the purpose of the contract as a whole. At this day the tendency is the other way. The court looks to the purpose and effect of the contract as a whole as a guide to the probable intention of the parties, and the presumption, if any there be, is that breach or default in any material term of a contract between men of business amounts to default in the whole."

A similar thought is expressed on page 325:

"If, however, there be any presumption either way in the modern view of such cases, it is that in mercantile contracts at any rate all express terms are material. Merchants are not in the habit of placing upon their contracts stipulations to which they do not attach some value and importance. Bowes v. Shand (1877) 2 App. Cases, 463. In a case not mercantile (Wilkinson v. Clements [1872] L. R. 8 Chan. 110) Lord Justice Mellish said: 'I quite agree that as a general rule all agreements must be considered as entire. Generally speaking, the consideration for the performance of the whole and each part of an agreement by one party to it is the performance of the whole of it by the other, and if the court is not in a position to compel the plaintiff, who comes for specific performance, to perform the whole of it on his part, the court will not compel the defendant to perform his part or any part of the agreement. As a general rule, therefore, an agreement is entire.'"

And in 7 Amer. & Eng. Enc. of Law (2d Ed.) p. 95, par. 4, it is said:

"A contract is entire when by its terms, nature, and purposes it contemplates and intends that each and all of its parts, material provisions, and the consideration are common each to the other and interdependent. A divisible contract is one in its nature and purposes susceptible of division and apportionment, having two or more parts in respect to matters and things contemplated and embraced by it, not necessarily dependent upon each other, nor is

it intended by the parties that they shall be. The question depends largely upon the intention of the parties as determined from the language of the contract and the subject-matter."

In a recent treatise on the law of contracts (3 Page on Contracts [1905] § 1484), the author states the rule derived from the case to be as follows:

"In determining whether a contract is entire or severable, the intention of the parties is paramount, and, if this intention is clearly expressed, no question can arise as to which class of contract it is. This intention is, however, often not clearly expressed, as the parties have generally no clear idea whether the contract is entire or severable, and no definite idea of the legal consequences which would follow from its being in either class. The intention of the parties must therefore be deduced from the language used by the application of the ordinary rules of construction."

See, also, Loud v. Land Co., 153 U. S. 564, 14 Sup. Ct. 928, 38 L. Ed. 822, and State v. Davis, 53 N. J. Law, 147, 20 Atl. 1080.

But in the very nature of the subject-matter the intention here cannot be in doubt. The plaintiff contracted for a single and indivisible thing, namely, a complete statue; and a sketch model or a staff model was of no value whatever except as a step toward the end in view. Taken by itself, neither model would be worth anything to the plaintiff. The price to be paid was a lump sum, and was certainly intended to be applied upon the purchase of a finished work, and not to be employed in the impossible effort to buy from time to time fractional parts of what was incapable of division. The statue was to be an artistic performance. It was to be designed, modeled, and sculptured by the artist himself. Into it must of necessity enter the skill and talent, perhaps the genius, of the sculptor, and whatever else may comprise his personal equation; and it is not feasible to deliver such a product by installments. It is true that the price might be made payable not in one sum at the end of the work, but in specified portions from time to time. Such a method of payment would be likely to suit the convenience or the needs of the artist, and it would be natural to fix upon the successive steps towards the completion of the statue as the times when successive advances should be made upon the price. But the choice of such steps was plainly arbitrary. The first day of certain months might have been selected with quite as much propriety; and, if particular days had been selected, their choice would have had just as much, or as little, bearing on the construction of the contract as the choice of the successive steps toward the end of the work.

In brief, the plaintiff bargained for an artistic production—for a statue, which was in itself as indivisible as a painting or an engraving. Th price was a unit, although it was to be paid by installments. Two of these installments were paid, but the statue has never been completed. Under such circumstances, to say that the plaintiff has suffered no loss, although it has had no gain from the contract, but has paid $7,000 to the defaulting artist, is to take a position that I do not think can be successfully maintained.

If authority is needed to support the verdict, it may be found in Janes v. Scott, 59 Pa. 178, 98 Am. Dec. 328, and Union Trust Co. v. Citizens' Trust Co., 185 Pa. 217, 39 Atl. 886. In Janes v. Scott it

appeared that Janes had guaranteed that Burke would furnish certain machinery and dig an oil well for Scott. It was shown that Scott had paid Burke $1,370 as the work went on (in addition to a sum not now important), and that Burke had abandoned the contract before completion. Janes asked for an instruction that no more than nominal damages could be recovered, but the trial judge refused the point, and instructed the jury that the contract was entire, and that Burke's right to be paid depended upon his completing the work. It follows from this that previous payments were contingent advances, which could be reclaimed if the contract was not finished. The verdict was for $1,527.55 (apparently $1,370 with interest), and the Supreme Court held that Scott was entitled to recover this sum against the guarantor, saying:

"The loss of the plaintiffs was at the very least what they had paid (to Burke), and this the court held the plaintiffs might recover. There was no error in this."

In Union Trust Co. v. Citizens' Trust Co., the evidence was that the plaintiff had advanced to Klein (who was a builder) two bonds of $1,000 each, upon which Klein was to raise money to build two houses for the plaintiff. The defendant company guaranteed the completion of the houses, and agreed to save the plaintiff harmless against loss or damage not exceeding $2,000. Klein pledged the bonds for other purposes, dug one or both of the cellars, and then abandoned the operation. The Supreme Court sustained a direction to find for the plaintiff, saying (page 222 of 185 Pa., page 886 of 39 Atl.):

"But the covenant on which the plaintiff rests this action is that in which the defendant undertakes to be liable to the extent of $2,000 for the performance of the building contract by Klein. The breach alleged is the total failure on his part to build at all. The damages claimed are the $2,000 paid in advance for which the plaintiff has received nothing. The learned judge of the court below held correctly that as the case stood at the close of the evidence the plaintiff was entitled to recover. * * * The plaintiff is entitled to have its bonds returned to it, or, if that cannot be done, to be reimbursed for its loss."

I see no essential difference between these decisions and the present case.

The motion for a new trial is refused. The motion for judgment notwithstanding the verdict is also refused, and to this refusal an exception is sealed.